Sucesión Igaravídez et al., Demandantes y Apelantes, v. Rubert Hermanos et al., Demandados y Apelados.

Apelación procedente de la Corte de Distrito de San Juan, Sección 2ª., en causa sobre devolución de propiedad.

No. 1024.—Resuelto en diciembre 8, 1915.

Interés en la Acción—Demandante.—Una persona que no tiene interés en la acción, no tiene derecho a comparecer ante una corte como demandante a impugnar escrituras o procedimientos referentes a la misma.

Tutor—Administrador—Procedimiento Ejecutivo.—El hecho de ser una persona tutor de los menores cuyos bienes están en venta o sujetos a procedimientos ejecutivos, no le impide ser nombrada administradora de dichos bienes, pues como tal puede defender mejor los intereses de sus pupilos.

Fraude—Presunción.—El fraude no se presume meramente y cuando se alega debe ser claramente probado.

Id.—Terceros—Presunción.—En este caso un hermano de los socios de la firma Rubert Hermanos era apoderado de José Gallart en la época en que éste vendió a dicha sociedad los bienes objeto de este litigio. Más tarde dicho apoderado adquirió para sí derechos en la referida sociedad Rubert Hermanos. *Se resolvió:* Que el hecho de que un hermano de los socios de la demandada era apoderado del vendedor en la época de la compra y que luego adquirió un derecho en la referida sociedad no justifica la suposición de que el conocimiento que éste tenía de los hechos anteriores deba imputarse a sus hermanos hasta el punto de anular su derecho a ser considerado como tercero. Si solamente están envueltas las irregularidades e ilegalidades que se alegan en la venta bajo ejecución es dudoso que el conocimiento de éstas por los compradores anulara su derecho.

Prescripción—Interrupción de la Prescripción.—Para que exista interrupción en un derecho adquisitivo de prescripción, especialmente si tiene lugar mediante una acción, es necesario que ésta sea de la misma naturaleza que la del presente pleito.

Impedimento o Estoppel—Abandono o Laches.—Cuando un demandante ha aceptado arreglos y traspasos en una ejecución de hipoteca está impedido (*estopped*) de atacar los procedimientos ejecutivos tanto más cuanto se ha beneficiado de los mismos sin hacer esfuerzo alguno para atacar su validez, lo que le hace asimismo culpable de abandono (*laches*).

Conocimiento Judicial—Sentencia de una Corte de Apelación.—No puede tomarse conocimiento judicial de una sentencia de una corte de apelación para determinar un hecho, a menos que de los autos conste que dicha sentencia fué sometida directamente a la corte sentenciadora.

Ejecución de Hipoteca—Ataque Colateral—Defensa.—Un ataque colateral contra los procedimientos sobre ejecución de hipoteca, debe hacerse a las verdaderas defensas de los deudores hipotecarios y no a los defectos técnicos de la venta en ejecución.

Hipoteca—Condueño—Mujer Casada.—Una mujer casada, condueña en una propiedad, tiene derecho a hipotecar su participación en garantía de deudas contraídas para beneficio de la propiedad. La Ley 61 de Toro declara nula cualquier fianza prestada por una mujer casada para garantir las deudas de su marido, pero no anula la obligación contraída por ella como deudora principal.

Escritura Mancomunada—Herederos.—Aun cuando la Ley de Toro declare nula una escritura otorgada de mancomún por marido y mujer, las únicas personas que podrían beneficiarse de esa nulidad serían los herederos de la esposa.

Testigos Instrumentales—Práctica Contemporánea.—En la fecha en que se constituyó la hipoteca objeto de esta acción, las cortes ciertamente toleraban la falta de firmas de testigos instrumentales en las escrituras originales y esa interpretación contemporánea debe ser respetada.

Acción Real—Acción Personal—Notificación al Demandado.—No existiendo nada en los autos que demuestre que la acción ejercitada, aunque comprende bienes inmuebles y hasta ese punto es real, sea otra cosa que una acción personal por lo menos en lo que respecta a uno de los demandados, se hace necesaria la notificación personal de éste.

Los hechos están expresados en la opinión.

Abogados de los apelantes: *Sres. Rafael López Landrón, Enrique Rincón y José R. F. Savage.*

Abogados de los apelados: *Sres. Alvarez Nava & Domínguez y Francisco de la Torre.*

El Juez Asociado Sr. Wolf, emitió la opinión del tribunal.

Este es un caso en el cual poco o nada se hizo en la corte inferior por simplificar las cuestiones en controversia. Por una u otra razón que no aparece enteramente explicada, se permitió a los apelantes incluir en la demanda un gran número de cuestiones que son innecesarias e impertinentes, algunas de las cuales no tienen al parecer ninguna relación con las causas de acción que se alegan. La teoría fundamental de la demanda fué que debido a los actos de varias personas y especialmente de José Gallart y otros que intervinieron en la ejecución de cierta hipoteca, quedó privada la Sucesión de Leonardo Igaravídez de ciertos derechos de propiedad. Además, en la demanda se sostiene más o menos consecuentemente la teoría de que para que pueda ser restablecida la

Sucesión de Leonardo Igaravídez en sus derechos tiene que declararse que cierta venta por ejecución, así como la hipoteca que a la misma sirvió de base, son absolutamente nulas y sin ningún valor y si necesario fuere, que son inexistentes. A la Sucesión de Leonardo Igaravídez se han unido las Sucesiones de Carmen Landrón y de Manuel López con el fin aparente de prestarle su ayuda para demoler la ciudadela erigida por el enemigo común José Gallart y de cuya destrucción las dos últimas sucesiones esperarían obtener algún beneficio. Si la Sucesión de Manuel López y la Sucesión de Carmen Landrón jamás renunciaron ninguno de sus primitivos derechos, dejando a un lado las cuestiones de prescripción, quizás pudieron haber seguido una acción contra Rubert Hermanos sobre partición de bienes. En esta demanda, sin embargo, no se trata de modo alguno de una acción de partición, habiendo sido fuertemente atacados los derechos de los demandados a cualquier parte de los bienes y sólo reconocidos vagamente cuando la Sucesión de Manuel López, los hermanos López Landrón, reclaman una hipoteca legal. Ni siquiera entonces se reclama en una sola de las treinta y seis causas de acción que han sido alegadas dicha hipoteca legal como base de la acción. La demanda en su forma, es una narración indefinida, a la cual acompañan lo que ordinariamente se llaman solicitudes o peticiones. Los apelantes las denominan "causas de acción," las cuales discuten una por una (*seriatim*) en su alegato. No puede haber teoría alguna compatible con la demanda que no sea la de anular el título o títulos que los demandados alegan tener por virtud de la hipoteca y venta de la finca en ejecución de la hipoteca. Esta teoría está robustecida por varias cuestiones que obran en los autos y particularmente por el hecho de que en la hipoteca que ha sido impugnada Leonardo Igaravídez y Carmen Landrón figuran hipotecando toda la propiedad y no sus participaciones por separado y porque el procedimiento hipotecario se siguió contra toda la propiedad. Desde luego que con arreglo a los artículos 406 y 1758 del Código Civil, la hipoteca

en realidad únicamente tenía aplicación a sus participaciones individuales.

Los apelantes han presentado un alegato de unas 392 páginas en maquinilla, y con la idea de prestar la debida consideración a las innumerables reclamaciones que se hacen, se ha dilatado la resolución de este caso.  El juez de la corte inferior, Sr. Gill, fallecido, emitió una opinión muy autorizada con la que estamos de acuerdo en sus principales aspectos.  Los apelantes al impugnar el razonamiento de la corte, alegan un gran número de errores, cuando en realidad de verdad sólo uno podía ser alegado, o sea, el haber dejado la corte de dictar sentencia a favor de los apelantes, o al menos, algunos de ellos, al hacer las extensas alegaciones de fraude, ilegalidades y nulidades.

El juez de la corte inferior aunque criticado por los apelantes expresa que la materia objeto de la acción en este pleito era conocida con el nombre de finca San Vicente, de Vega Baja.  Había otras parcelas comprendidas en el litigio, pero la finca en su totalidad estaba dedicada al cultivo y molienda de cañas.  La propiedad era conocida y todavía se conoce por "San Vicente," si bien su título fué cambiado más tarde por el de "Central San Vicente."

Adoptando esta forma lacónica de hablar de la cuestión, diremos que la finca San Vicente la poseía Jacinto López quien falleció en el año 1863.  Al hacerse la división de sus bienes la finca se le adjudicó a su hijo Manuel Antonio López Martínez y a tres de sus hermanos.  Durante los comienzos del año 1864, Manuel compró las participaciones que tenían dos de sus hermanas en la finca San Vicente obteniendo un arrendamiento de la tercera.  Manuel falleció en noviembre, 1865, dejando una viuda, Carmen Landrón y tres hijos.  Carmen Landrón no aportó nada a la sociedad conyugal; se le adjudicaron 11,000 *pesos* más o menos, como parte de sus bienes gananciales y 117,000 *pesos* para pagar las deudas de Manuel.  El resto de la finca, o sean unos 88,000 *pesos,*

fué adjudicado a los tres hijos, herederos testamentarios de Manuel.

En 1866, la hermana de Manuel, Teresa de Jesús López Martínez que había quedado como única condueña con Manuel vendió su participación al presbítero Antonio García que después la vendió a Leonardo Igaravídez quien le pagó unos 40,000 *pesos* en efectivo y dió hipoteca por el saldo. De modo que en noviembre de 1866, los condueños de San Vicente eran los tres hijos López Landrón, con un interés entre todos de 88,000 *pesos;* la viuda Carmen Landrón, con un interés de 11,000 *pesos* por sus bienes gananciales y 117,000 *pesos* para responder de las deudas de su difunto marido, y Leonardo Igaravídez con un interés de 98,000 *pesos,* más o menos. Don Leonardo era entonces viudo con un hijo y dos hijas, constando que el hijo murió en su minoridad. Una de las hijas murió después y la otra constituye la Sucesión Igaravídez Santana.

En noviembre de 1866, Leonardo Igaravídez se casó con Carmen Landrón de cuyo matrimonio resultaron seis hijos que constituyen la Sucesión Igaravídez Landrón. Las tres Sucesiones, la López Landrón, la Igaravídez Santana y la Igaravídez Landrón, son las demandantes en este pleito. Al tiempo del matrimonio la hacienda de referencia estaba gravada con la hipoteca a favor del presbítero Antonio García y con dos hipotecas más a favor de las dos hermanas de Manuel para asegurar el precio de la venta de sus respectivos condominios.

La corte inferior llama la atención hacia el hecho de que las cargas que existían sobre la finca San Vicente en el año 1866 se pagaron, por lo menos en parte. También expresa que ninguno de los demandantes en este pleito se presentó ante la corte con la calidad de heredero de las hermanas de Manuel, ni como heredero del presbítero García, ni tampoco se presentaron los demandantes en representación de cualquier otro acreedor que tuviera derecho de reclamación contra los dueños de la finca en 1866, o, en alguna otra fecha

posterior. Mucho se dijo en la demanda acerca de los distintos gravámenes y de los derechos de los varios acreedores, pero estas diferentes alegaciones, según las entendemos, tenían por objeto mostrar que los actos de Gallart y otros necesariamente tenían que ser ilegales por razón de estos distintos gravámenes y créditos alegados. La corte puntualizó el hecho de no representar los demandantes a ningún acreedor. En verdad que en toda la demanda se hacen varios ataques contra los títulos inscritos de los demandados basados en hechos o alegaciones que otras personas podrían haber alegado, pero en los cuales ninguno de los demandantes tenía interés alguno. También opinamos que esta omisión en comprender que una persona que impugna una escritura o procedimiento por ser nulo debe tener interés en el asunto, sirve de explicación a un número de ideas erróneas de los apelantes. Desde la fecha del matrimonio Leonardo estuvo al frente de la administración de la finca en representación de sus propios intereses y de los de su esposa y sus tres hijos habidos en el primer matrimonio de ésta, que entonces eran menores.

En octubre 8, 1869, Leonardo Igaravídez y Carmen Landrón otorgaron una hipoteca en San Juan por 100,000 *pesos,* a favor de Sturges y Compañía constando de la escritura que el dinero había sido tomado, prestado y usado en el cultivo, mantenimiento y trabajo de la hacienda San Vicente. No vemos nada en los autos que nos haga dudar de que estas narraciones fueran substancialmente correctas, ni tampoco tuvo dudas el juez de la corte inferior.

En agosto 28, 1875, en la ciudad de San Juan y ante el mismo notario, los dichos Sres. Sturges y Compañía vendieron a Juan Forgas el referido crédito hipotecario y dichos Igaravídez y Carmen Landrón fueron partes en la misma escritura autorizando la venta y ratificando o confirmando la hipoteca.

Leonardo Igaravídez quebró en 1879, durando los procedimientos de quiebra hasta el año 1887, en que nuevamente se hizo a Leonardo Igaravídez administrador de la finca.

Los diversos acreedores, con excepción de Juan For-
gas, dueño de la hipoteca, habían hecho un convenio con
Igaravídez por virtud del cual se le permitió seguir con la
administración.

Leonardo Igaravídez falleció en 1888, habiendo muerto
antes su esposa y no tuvo oportunidad de pagar a sus acree-
dores. La quiebra contra él no finalizó en vida del mismo.

En abril 9, 1888, Julián Blanco autorizado por Igaravídez
mediante poder para testar otorgó tal testamento declarando
herederos a sus hijos habidos en ambos matrimonios los
cuales aceptaron la herencia a beneficio de inventario. A
pesar de estar vencida la hipoteca, el acreedor hipotecario
demoró por ciertas razones la ejecución de la misma, hasta
que en 22 de junio de 1888, se inició un procedimiento sobre
ejecución de hipoteca a nombre de José Gallart y Forgas,
como heredero y sucesor de su tío Juan Forgas, por medio
de procurador debidamente nombrado y de abogado. El
procedimiento ejecutivo, que es un procedimiento especial
de acuerdo con la Ley de España, se siguió ante el Juez de
Primera Instancia de San Juan. El procedimiento fué por
la suma de 74,000 *pesos* más o menos, que era el saldo pen-
diente de la hipoteca, y se dirigió contra los bienes de la
Sucesión de Leonardo Igaravídez y especialmente contra la
hacienda San Vicente. El acreedor hipotecario mientras
procedía contra la finca de Leonardo se reservó todos los
derechos que pudiera tener contra la Sucesión de Carmen
Landrón por virtud de dicho crédito hipotecario. A la
demanda en este procedimiento hipotecario se unió la hipo-
teca y su ratificación así como también la cláusula pertinente
del testamento de Forgas instituyendo a Gallart como here-
dero suyo, y una certificación del Registrador de la Propiedad
de Ponce creditiva de la muerte de Juan Forgas.

En julio 6, 1888, el Juez de Primera Instancia se negó a
despachar el mandamiento de ejecución por el defecto téc-
nico de no tener el registrador facultad para certificar sobre
la muerte de una persona. Al solicitar reposición el acreedor

hipotecario el juez no solamente insistió en este supuesto defecto, sino que también negó la ejecución por el fundamento de que la hipoteca otorgada por Leonardo Igaravídez y Carmen era de la clase prohibida por la Ley de Toro, puesto que la esposa comparecía como fiadora de las deudas del marido. Esta orden del Juzgado de Primera Instancia fué apelada a la Audiencia Territorial que confirmó en parte la orden del Juzgado de Primera Instancia. La naturaleza, sentido y alcance de la resolución de la Audiencia Territorial han sido tal vez el fundamento principal de discusión en este caso. Más adelante explicaremos con más detalles este procedimiento.

Sostienen los apelados que la Audiencia sólo confirmó la orden del Juzgado de Primera Instancia por el defecto técnico apuntado, y evidentemente basado en esta teoría fué que el acreedor hipotecario siguió adelante con el procedimiento de ejecución. El Juez de Primera Instancia en vista de la subsanación del defecto procedió a ordenar la ejecución de la hipoteca rebajando un tanto la suma de la reclamación por haber expirado el término para ejecutar uno de los plazos de la deuda.

Los apelantes impugnan por ser fraudulenta la acción así tomada por el Juzgado de Primera Instancia, alegando también otros varios fraudes, ilegalidades y nulidades cometidos en la ejecución del procedimiento hipotecario, acerca de los cuales después haremos referencia.

En esta fecha "San Vicente," que entonces se conocía por "Central San Vicente" estaba administrada por Julián E. Blanco, nombrado como tal administrador por los acreedores en los procedimientos de quiebra. Blanco era a la vez tutor de algunos de los hijos de Igaravídez Landrón. Por esta razón y con el fin de evitar costas y demoras, el acreedor hipotecario nombró también a dicho Blanco como administrador de la finca mientras duraban los procedimientos hipotecarios, teniendo cada uno confianza en su capacidad y honradez. Alegan los apelantes que su cargo de tutor era incompatible

con el de administrador de la finca.  No vemos ninguna incompatibilidad en que el tutor de una sucesión cuya finca está para venderse o gravada por virtud de un procedimiento de ejecución se haga cargo de la administración de dicha finca. El mejor que nadie podía defender los derechos de sus pupilos.  También sus actos han sido atacados como fraudulentos, existiendo la acusación, que no ha sido comprobada, de que él actuaba en combinación con Gallart contra los intereses de sus pupilos.

Al otorgar Igaravídez y su esposa Carmen Landrón la hipoteca, lo hicieron por toda la finca San Vicente.  Ellos en realidad no la poseían totalmente pues los hermanos López Landrón eran condueños con ellos.

En el año 1885, estando pendientes los procedimientos de quiebra, el Juez de Primera Instancia ordenó que la quiebra satisficiera a los hermanos López Landrón la suma de 1,000 *pesos* como parte proporcional de las rentas y productos en la hacienda.  Dicho juez se dió cuenta de la imposibilidad que había para administrar por separado la participación perteneciente a Igaravídez, probablemente debido al hecho de que la central se encontraba realizando operaciones, y basado en una teoría parecida Gallart siguió su procedimiento hipotecario contra toda la finca pero durante la pendencia del procedimiento o en fechas posteriores celebró transacciones o traspasos con los López Landrón e Igaravídez Landrón. La validez, exactitud o suficiencia de todos estos actos posteriores han sido atacadas por los demandantes y apelantes en este caso.

Se verificaron varias segregaciones y cambios en la propiedad y finalmente en mayo 31 de 1894, se otorgó escritura al acreedor hipotecario Gallart en la que se describían todos los procedimientos habidos en la ejecución de la hipoteca, cuya escritura fué inscrita en el registro de la propiedad en julio 7, 1894.  La referida finca fué vendida por Gallart a Juan y Guillermo Rubert en febrero 24, 1897.  Los apelantes

alegan hechos tendentes, como sostienen, a acreditar que Rubert Hermanos no eran terceros de acuerdo con la Ley Hipotecaria por razón de los actos de Luis Rubert, uno de los hermanos de Juan y Guillermo Rubert. En 12 de diciembre, 1902, Guillermo Rubert vendió una parte de su derecho en la Central San Vicente a su hermano Luis. Sostienen los apelados Rubert Hermanos que han poseído la finca desde la fecha de sus varias adquisiciones pacíficamente y sin interrupción alguna.

Esta acción comenzó originalmente en junio 5, 1906, habiéndose formulado una demanda enmendada en febrero 18, 1909. La sucesión de José Gallart fué incluída en la demanda y se obtuvo su emplazamiento por publicación de edictos, y una demanda enmendada fué presentada después de dicho servicio. El secretario anotó la rebeldía y los demandantes, trataron de obtener una sentencia en rebeldía contra la Sucesión de Gallart con cuyo objeto fueron extensamente oídos en la corte. Se dictó por último sentencia declarando sin lugar la demanda contra la cual interpusieron, recurso de apelación los demandantes si bien jamás fué notificada la Sucesión de José Gallart de dicha apelación. Los apelados en distintas fechas han solicitado la desestimación de la apelación fundados en que la Sucesión de José Gallart era parte necesaria y por consiguiente que debió haber sido, notificada. Ellos han insistido en que la Sucesión de José Gallart era parte necesaria no sólo por haberlo hecho así los demandantes por varios actos y documentos obrantes en los autos, sino también porque en el traspaso de la finca hecho por José Gallart a Rubert Hermanos la escritura contenía una cláusula sobre saneamiento y evicción del título.

Ha habido varias acusaciones de fraude en este caso. Las imputaciones de fraude hechas contra el Juez de Primera Instancia que finalmente ordenó la venta en ejecución, no han sido comprobadas en absoluto. Respecto al cargo de fraude contra Julián Blanco y Sosa, deseamos citar, como lo

hizo la corte inferior, el poder otorgado por Leonardo Igara-
vídez, por virtud del cual autorizó éste al primero para hacer
su testamento:

"Teniendo una ilimitada confianza en su amigo y apoderado gene-
ral que lo es Don Julián Eusebio Blanco y Sosa el cual se encuentra
enterado perfectamente de todos sus asuntos y negocios ha deter-
minado autorizarle con poder bastante para testar, con cuyo objeto,
en la vía que sea más procedente otorga; que da y confiere al men-
cionado Don Julián Eusebio Blanco y Sosa de este propio vecindario,
el más cumplido, amplio y bastante poder como por derecho se
requiera para que dentro o fuera del término legal y con sujeción
a las instrucciones que le tiene dadas y en lo sucesivo le comunicare,
organice y ordene su testamento, etc., etc.

"Declara por ser así su voluntad expresa que Don Julián Eusebio
Blanco y Sosa además de ser su apoderado general ha sido el encar-
gado de la dirección de todos los asuntos judiciales que le han ocurrido
desde muchos años sin que hasta el día ni Blanco le haya exigido ni
tampoco el otorgante le haya retribuído sus buenos y valiosos ser-
vicios a pesar de haberle exigido le manifestara el importe de sus
trabajos o cantidad con que debiera recompensar en las diversas
veces que así se lo ha indicado, sin que haya podido obtener de Blanco
otra manifestación que la de aplazar el asunto para mejor ocasión;
así es que considerando un deber de conciencia dicha retribución
encarga muy encarecidamente, tanto a sus albaceas como a sus here-
deros, exijan a Blanco les manifieste el valor de todos sus servicios
y trabajos, los que les sean satisfechos con toda religiosidad y pre-
ferencia atendida la naturaleza e importancia de dichos servicios."

Y luego expresa el Juez Sr. Gill en su opinión:

"Tal era el carácter de Blanco en la opinión de Leonardo Igara-
vídez en 1888. No se ha establecido en este pleito que la opinión
de Don Leonardo Igaravídez fuera errónea o que se modificara más
tarde el carácter de Blanco en sentido malévolo.

"A otras personas también, jueces, abogados y procuradores se
acusa de fraude. A esta corte le falta la experiencia subjetiva en
la corrupción judicial, pero parece extraordinario que si los repre-
sentantes de Gallart habían sobornado a las Cortes de Primera Ins-
tancia de San Juan, no se podía conseguir una declaración definitiva
en menos de siete años. En otras palabras, si un juez vende su
sentencia ordinariamente falla pronto."

Los apelantes han imputado fraude en forma poco concreta y no lo han probado. Varias veces hemos tenido oportunidad de llamar la atención hacia el hecho de que el fraude no se presume y debe ser claramente probado. *Calzado et al.* v. *Carrero et al.,* 15 D. P. R. 363; *Lamas et al.* v. *Roig,* 15 D. P. R. 494; *Cruz* v. *López et al.,* 17 D. P. R. 42. El abogado lo ha presumido esperando que este tribunal lo deduzca de ciertas supuestas nulidades o ilegalidades.

Los demandados y apelados ante esta corte son Rubert Hermanos. Sostienen los apelantes que los apelados no pueden ser considerados como terceros por haber sido Luis Rubert apoderado de Gallart quien tenía conocimiento de todos los hechos anteriores, pero no nos han demostrado los apelantes que el conocimiento que tenía Luis Rubert pudiera imputarse a Rubert Hermanos en la fecha en que éstos compraron a Gallart. Es verdad que Luis Rubert adquirió luego su derecho en la sociedad y que su parentesco cercano con sus hermanos Juan y Guillermo Rubert podría considerarse como una circunstancia sospechosa, pero no podemos suponer sin más prueba que cualquier conocimiento que él tuviera podía imputarse a sus referidos hermanos. Además, como ya hemos dicho, los apelantes no nos han indicado ningún fraude. El traspaso hecho por Gallart a Rubert Hermanos se impugna por haber sido Luis Rubert mandatario de Gallart. Sin considerar los demás méritos de esta alegación, diremos que los apelantes no tienen ningún interés legal por el cual puedan atacar el traspaso. Si solamente están envueltas las irregularidades e ilegalidades que se alegan en la venta por ejecución, dudamos que el conocimiento de las mismas pueda anular el derecho de una persona a ser considerada como tercero. También dudamos de si a los abogados y procuradores de Gallart podía imputárseles conocimiento de las ilegalidades en la venta en ejecución y si en su caso dicho conocimiento podía suponérsele a Luis Rubert o a Gallart, ambos sin profesión, que como es de presumirse obedecían y confiaban en el consejo del abogado. Si el hecho de ser tercero

pudiera redundar en beneficio de cualquier persona en este caso, no vemos nada en los autos que impida a Rubert Hermanos gozar de esa condición con respecto a la propiedad que adquirieron de Gallart.

Los apelados alegan un derecho adquisitivo de prescripción por haber estado en posesión de las fincas, como sostienen, por más de diez años, quieta y pacíficamente. Los apelantes sostienen que ha habido interrupciones en ese título adquisitivo. No estamos convencidos de que en realidad exista tal interrupción. Sin entrar en una discusión acabada de una cuestión que es una de las muchas que han sido promovidas en este pleito, podemos decir que la interrupción especialmente si tiene lugar mediante una acción, tendría que ser de la misma naturaleza que el presente pleito. En lo que respecta a la Sucesión de Leonardo Igaravídez tenemos algo más que dudas de si una reclamación como la que se hace en este pleito se hizo alguna vez, ya judicial o extrajudicialmente dentro del período de diez años.

Sin embargo, en cuanto a la alegación de los apelados de ser terceros sostienen los apelantes que el registro no puede dar validez a actos que son nulos; y respecto a la alegación de prescripción adquisitiva alegan que los apelados no tenían justo título. Cada una de estas alegaciones equivale a decir que todos los actos encaminados a la venta en ejecución y las escrituras en las cuales se basaba el procedimiento hipotecario eran absolutamente nulos. Surge entonces la cuestión de cuál de las varias sucesiones en este caso está en condición de hacer tal alegación, pero antes de resolverla debemos examinar la reclamación extraordinaria de la Sucesión López por supuesta hipoteca legal.

En el alegato se considera al parecer esta reclamación como la número cuarenta y uno de la demanda enmendada. Los apelantes sostienen en su alegato que existen treinta y seis causas de acción diferentes y asimismo al discutir la moción para desestimar la apelación dice el abogado que ellos agregaron la trigésima sexta causa de acción a la

demanda original. La demanda enmendada contiene exactamente treinta y seis solicitudes si bien en el alegato de los apelantes se discuten cuarenta y seis. Las diez últimas solicitudes comprenden una referencia a la supuesta hipoteca legal, pero los hechos de esta hipoteca legal se determinan en el Párrafo XIII de la demanda enmendada. La teoría parece ser (aunque se alega más en el Párrafo XIII) que aunque se pagó a los hermanos López Landrón cierta suma como perteneciente a su herencia no se les pagó el total de ella, y por tanto que como Leonardo Igaravídez había entrado en posesión de todos los bienes de los menores López Landrón, Gallart y su causahabiente Igaravídez serían responsables por esta reclamación de derechos. Sin embargo, los hermanos López Landrón eran condueños con Igaravídez y Carmen Landrón. Todo lo que reclaman que había quedado de su herencia paterna era por razón de dicha comunidad. No vemos nada que justifique la suposición en favor de la Sucesión de López de cualquier hipoteca por parte de Leonardo Igaravídez en cuanto a éste u otro particular. Si la Sucesión de López Landrón fué despojada ilegal e indebidamente de algo que legítimamente la correspondía, la teoría de la hipoteca legal nunca daría lugar a una acción a su favor, de acuerdo con los hechos de este caso.

Existe prueba suficiente en los autos de que la Sucesión de López Landrón celebró convenios con Gallart por los cuales tanto la herencia paterna como la materna se les entregaron. El hecho de tales traspasos no ha sido discutido formalmente pero los apelantes López Landrón pretenden alegar que este traspaso, transacción o arreglo únicamente era un *modus vivendi* y sólo comprendía cierta porción pequeña de la finca. Aun cuando esto fuera cierto, los hermanos López Landrón que entonces eran todos mayores de edad permitieron que Gallart continuara la ejecución y entrara en posesión de la finca sin discutir formalmente su derecho hasta hacerlo más o menos vaga e indirectamente en esta demanda. Como ya hemos dicho, la teoría de la demanda

no era la partición de la finca sino que en ella se pretendía
anular una venta en ejecución y obtener así cualquier beneficio
que pudiera resultar a los apelantes.  Pero creemos que la
verdad de la cosa fué que cuando estos traspasos se hicieron,
la propiedad debido a la quiebra y a los procedimientos de
ejecución probablemente valía muy poco y que los hermanos
López Landrón recibieron sus debidas partes proporcionales.
Los mismos apelantes en otras partes de su alegato sostienen
que se permitió que se arruinara la finca debido a la mala
administración de Blanco y por esto han hecho una reclama-
ción independiente y precisa contra la Sucesión de Gallart.
No creemos que la Sucesión de López Landrón esté en con-
dición para poder impugnar el procedimiento hipotecario ni
siquiera la hipoteca misma; sus actos, y éstos fueron de
distintas clases como aparece de los autos, se lo impidieron.

Semejantes consideraciones son aplicables a la Sucesión
de Leonardo Igaravídez respecto a su herencia materna.
Gallart celebró con ellos transacciones y traspasos.  Es ver-
dad que algunos o todos ellos eran menores en la fecha del
traspaso, pero consta que estuvieron representados debida-
mente no solamente por un tutor sino por su medio hermano
Manuel López Landrón como curador *ad litem*.  Este último
comparece no solamente en ciertos traspasos originales cele-
brados entre las partes sino también en algunos traspasos
subsiguientes por virtud de los cuales Gallart adquirió otras
porciones de la hacienda "San Vicente."  Además, todo en
los autos indica que dicha Sucesión de Leonardo Igaravídez
Landrón se benefició con estos cambios y quedó en posesión de
los mismos después de llegar a su mayor edad sin tratar de
hacer ninguna impugnación respecto a la validez de los refe-
ridos cambios.  Ellos no ofrecen devolver nada en este pleito.
Creemos que no sólo a ellos sino también a la Sucesión de
López Landrón es de aplicación la doctrina relativa a aban-
dono (*laches*).  Ya hemos discutido el hecho de que los cargos
de fraude imputados a Blanco, tutor, no fueron comprobados.
Puede que tenga o no relación con el caso el hecho de que

el acreedor Gallart no tratara de proceder contra los intereses
de Carmen Landrón si bien su hipoteca comprendía la par-
ticipación de ésta así como también la de Igaravídez. De
todos modos, si la Sucesión de Leonardo Igaravídez hubiera
hecho su reclamación a tiempo, ya Gallart o la Sucesión de
Rubert podría haber tenido derecho a alegar que tenían
derecho a una contrareclamación por virtud del contrato
celebrado por Carmen y por la parte no satisfecha del cré-
dito hipotecario original.

Ahora pasamos a la reclamación de la Sucesión Igaravídez,
que entre todos los apelantes está en mejor situación en este
pleito para atacar el procedimiento hipotecario, y que pro-
piamente es la sucesión demandante. Como ha dicho el juez
de la corte inferior, los procedimientos ejecutivos continua-
ron hasta el año 1895. Durante todo ese tiempo Igaravídez
Santana era mayor de edad habiendo llegado a su mayor
edad uno de los Igaravídez Landrón poco antes de 1888. El
procedimiento hipotecario dejó una deuda pendiente en favor
de Gallart por la suma de 300,000 *pesos*. La finca de Igara-
vídez era insolvente y se encontraba en manos de un adminis-
trador. Sería muy dudoso en vista de las circunstancias si
no eran los acreedores o el administrador de los acreedores
el que tenía derecho a proceder a anular la hipoteca en este
caso. Es evidente que los diferentes créditos excedían en
mucho al valor de la finca, y como hemos visto, los procedi-
mientos de quiebra jamás se terminaron.

Hemos creído conveniente, sin embargo, discutir los su-
puestos procedimientos de ejecución que como alegan los
apelantes fueron absolutamente nulos y sin ningún valor.
Insisten en que la Corte de Primera Instancia no acató la
sentencia de la Audiencia Territorial confirmatoria de la
sentencia dictada por el Juzgado de Primera Instancia, ne-
gándose a despachar la ejecución. Insisten además en que
la acción de la Audiencia tenía por objeto conservar en toda
su integridad la sentencia definitiva del Juez de Primera
Instancia por la cual se denegó la ejecución y principalmente

en el particular relativo a la insuficiencia de la escritura o escrituras otorgadas por Leonardo Igaravídez y Carmen Landrón a favor de los acreedores hipotecarios.

Los apelados en su alegato han tratado de llamarnos la atención hacia la sentencia que realmente dictó la Audiencia Territorial y solicitan que tomemos conocimiento judicial de la misma. Esto no podemos hacerlo porque no es parte de los autos y no nos consta que la referida sentencia fuera directamente sometida a la consideración de la corte sentenciadora. Los apelantes presentaron una copia que alegan es de la sentencia, la cual según sostienen es más o menos incompleta. Por otra parte existe en los autos una copia del auto disponiendo la ejecución de donde aparece que los defectos en los cuales insistió la Audiencia quedaron subsanados por los acreedores hipotecarios y que los únicos defectos en que insistió la Audiencia eran los más técnicos a que hemos hecho referencia, de donde se infiere que la Audiencia no declaró nula la hipoteca. Además el abogado Ramón Falcón que conocía todas las actuaciones fué llamado como testigo por los demandantes y apelantes y se le permitió declarar sin objeción alguna que el defecto de la demanda fué corregido. Por tanto, considerada la sentencia de la corte inferior la presunción sería que la corte dirimió el conflicto en favor de los apelados, existiendo todavía otra presunción más fuerte de que el Juez de Primera Instancia cuya sentencia jamás ha sido atacada directamente en casación u otra forma cumplió con lo dispuesto en la sentencia de la Audiencia. Se hace imposible creer que el Juez de Primera Instancia deliberadamente hiciera caso omiso del mandato de la corte superior y como hemos indicado, según también lo ha hecho la corte inferior, no existe prueba alguna de fraude.

Se alegaron varios defectos técnicos respecto a la venta en ejecución pero en cuanto a esto convenimos con la corte inferior en que ya es demasiado tarde para atacar ahora la sentencia en una acción original independiente. Las resoluciones de la Corte Suprema de España muestran que un

ataque colateral de la clase que aquí se ha alegado ha de dirigirse a las verdaderas defensas de los deudores hipotecarios y no a los defectos técnicos de la venta en ejecución. Sentencias del Tribunal Supremo de España de 14 de diciembre de 1891; 20 de enero de 1897; 11 de abril de 1902; 31 de diciembre de 1902, y 1º. de julio de 1903. Las mismas autoridades citadas por los apelantes no contradicen la anterior doctrina.

Una de las cosas que podría haberse atacado en un pleito ordinario, dejando a un lado el lapso de tiempo, es la suficiencia de la escritura de hipoteca. La queja principal del alegato de los apelantes y asimismo de las solicitudes es la insuficiencia de la hipoteca por ser una escritura mancomunada, prohibida según se alega, por la Ley LXI de Toro.

Como también lo ha demostrado la corte inferior los condueños de San Vicente eran Leonardo, Carmen y los menores López Landrón. Carmen era condueña de la finca y por tanto tenía perfecto derecho a hipotecar sus participaciones para garantir deudas contraídas para beneficio de la finca. La hipoteca de 1869 misma expresa que Sturges y Compañía habían suministrado y adelantado varias sumas de dinero que habían de ser y ciertamente fueron gastadas en el mantenimiento, mejora y cultivo de la plantación de cañas llamada "San Vicente." Convenimos con la corte inferior en que después de cuarenta años no puede ser negada la verdad de esa manifestación. La Ley LXI de Toro declara nula cualquier fianza otorgada por una mujer para garantizar las deudas de su marido, pero no anula una obligación contraída por una mujer como uno de los deudores principales. Todas las partes han pasado por alto lo que nos parece una cuestión muy importante respecto al particular y ésta es que Juan Forgas compró la hipoteca a Sturges y Compañía y que tenía él derecho a creer que las manifestaciones hechas en dicha escritura eran verdaderas. No hemos hallado en los autos prueba alguna de algún estado de cosas en contrario.

En relación con esto surge otra cuestión de impedimento (*estoppel*). Esta es una acción establecida en primer tér-mino por la Sucesión de Leonardo Igaravídez. Aun cuando la Ley de Toro declare nula una escritura mancomunada del marido y la mujer, las únicas personas que debidamente podrían beneficiarse de esa nulidad serían los herederos de la esposa. Los herederos de Leonardo Igaravídez no pueden tomar ninguna medida que él no hubiera podido haber tomado. La escritura, de acuerdo con las decisiones de esta corte, no era nula en cuanto a Leonardo, y además sus here-deros estarían impedidos para promover tal cuestión. Seme-jantes consideraciones serían aplicables a la alegación relativa a los actos nulos de Leonardo Igaravídez respecto a la maqui-naria suministrada por Cail y Compañía.

Otra de las ilegalidades de la hipoteca que ha sido alegada es que en ella no hubo testigos instrumentales. Poca duda puede haber acerca de cuál era la verdadera ley respecto a esta cuestión, aunque parece que la práctica contemporánea prácticamente constituyó en letra muerta el precepto del estatuto. Además, en la sentencia de la corte inferior se declara que de prevalecer esta cuestión referente a la falta de firma de testigos instrumentales todo el pleito tiene que fracasar pues algunas de las mismas escrituras originales otorgadas a la Sucesión de López carecían de la firma de testigos instrumentales. Las cortes en esa fecha evidente-mente toleraban la falta de firma de testigos instrumentales y esa interpretación *contemporánea* debe ser respetada.

En el gran cúmulo de reclamaciones insostenibles que han sido hechas por los apelantes puede que hayamos pasado por alto algunas que los apelantes han alegado con apariencia de razón, pero estamos satisfechos en vista de las contiendas litigiosas que no existe ninguna reclamación que haya sido hecha por cualquiera de los apelantes que no haya quedado resuelta por el tiempo o por los actos directos u omisiones de las partes o sus causahabientes.

Con una de las mociones para desestimar la apelación
se acompañó una copia parcial de la demanda original de
donde consta que ésta contenía treinta y cinco solicitudes.
Los apelantes afirman que la solicitud treinta y seis fué
agregada a la demanda enmendada y que la adición por sí
misma produjo un cambio esencial en la demanda. La soli-
citud treinta y seis es como sigue:

"Que en el ejecutivo de José Gallart y Forgas contra la Sucesión
de Leonardo Igaravídez han sido defraudados los miembros de la
Sucesión de Carmen Landrón Córdova y de Manuel Antonio López
Martínez, y que por esta razón también dicho ejecutivo es ilegal,
mandando que quede sin ningún valor ni efecto en cuanto a todos
los demandantes limitadamente, con las costas.''

Ahora bien, esta solicitud trigésima sexta muestra que la
teoría de la demanda todavía hacía necesario la nulidad del
procedimiento hipotecario y de la hipoteca en la cual se basó,
y si la Sucesión de Igaravídez Landrón y la Sucesión de
Manuel López tenían derecho a algún beneficio lo hubieran
obtenido de la corte por el mero hecho de las alegaciones de
la demanda y el hecho adicional de que eran partes en el
pleito. No creemos que con esta solicitud trigésima sexta
se introdujera ningún cambio esencial en la demanda enmen-
dada. Además todos, la corte inferior y las partes proce-
dieron y actuaron como si la Sucesión Gallart estuviera debi-
damente ante la misma. Esto aparece claramente de los
autos.

La introducción de la demanda es como sigue:

"Comparecen ahora, por medio de su abogado Rafael López Lan-
drón, los demandantes Laura Igaravídez Santana, por su propio
derecho y como única y universal heredera de su hermana Hortensia
Igaravídez Santana, Leonardo R. Igaravídez Landrón, Médico Ciru-
jano, vecino de Coamo, P. R., Guillermo Igaravídez Landrón, abogado,
vecino de Málaga, España, Enrique Igaravídez Landrón, propietario,
vecino de Vega Baja, P. R., Sor Carmen Igaravídez Landrón, Hermana
de la Caridad, vecina de Guanabacoa, República de Cuba, Sor Milagro
Igaravídez Landrón, Hermana de la Caridad, vecina de Granada,
España, y Mercedes Igaravídez Landrón, propietaria y vecina de

Peñuelas, P. R., asistida de su legítimo esposo Luis Alvarado San-
tiago, todos ellos mayores de edad; la Sucesión de Carmen Landrón
Córdova ·y la Sucesión de Manuel Antonio Martínez, conocidas y
admitidas en autos como asociadas, también demandantes, y estable-
ciendo su demanda enmendada contra la Sociedad 'Rubert Hermanos,'
compuesta de los Sres. Luis, Guillermo y Juan Rubert y Cátala y
contra esos mismos señores, así como también contra la Sucesión
desconocida de José Gallart y Forgas, cada uno por sí alegan y
exponen:''.

Por lo transcrito aparece que la teoría de la demanda
original era la de un pleito por la Sucesión de Igaravídez
para anular la hipoteca y el procedimiento hipotecario, y
somos de parecer que la demanda enmendada no introdujo
variación sustancial alguna.

Los apelantes en la corte inferior practicaron el servicio
de emplazamiento por publicación de edictos contra Gallart.
Se celebró el juicio después de haber presentado su demanda
enmendada y de radicada la contestación. En este juicio
invirtieron los apelantes varios días en probar su caso contra
la Sucesión Gallart habiéndose presentado mucha prueba
documental. En realidad de verdad la misma prueba docu-
mental fué admitida previo consentimiento de las partes en
el juicio posterior de Rubert Hermanos que tuvo lugar. En
otras palabras, los apelantes insistían en la corte inferior en
su derecho a que se dictara sentencia contra Gallart con
motivo de la rebeldía que hasta entonces había sido anotada.
Si el caso fuera revocado podrían los demandantes continuar
contra la Sucesión de Gallart de igual modo que si no se
hubiera presentado ninguna demanda enmendada puesto que
la demanda enmendada no introdujo nuevos hechos ni se
pedía en ella remedio alguno que no pudiera obtenerse con
la demanda original.

Al ser presentada la moción original para que se deses-
timara esta apelación insistieron los apelantes en el hecho
de que ellos intencionalmente no habían notificado a la Suce-
sión de Gallart de la apelación puesto que ya estaban en

rebeldía y no tenía más derecho a ser oída ante la corte.  Los
apelantes, sin embargo, sostienen ahora que debido a la pre-
sentación de la demanda enmendada la cual en realidad jamás
fué notificada mediante publicación u otra forma a la Suce-
sión de Gallart, que dicha sucesión no es parte en la apelación,
y se citan los casos de *McGary* v. *Pedrorena,* 58 Cal. 91;
*Thompson* v. *Johnson,* 60 Cal. 292 y de *Reinhart* v. *Lugo,*
86 Cal. 395, para probar que la presentación de una demanda
enmendada abre la rebeldía.  Pero estos casos muestran que
la enmienda debe ser sustancial y se insiste en esta diferencia
en el caso de *Cole* v. *Roebling Construction Co.,* 156 Cal. 446,
105 Pac. 257.  Además, en el caso de *Thompson* v. *Johnson,*
era un demandado el que impugnaba la sentencia dictada
por la corte inferior por no haber sido notificado otro deman-
dado.  Los apelantes también se fundan en el caso de *Clarke*
v. *Mohr,* 125 Cal. 540.  En ese caso se resuelve que no es
necesario que el aviso de apelación contra la sentencia sea
notificado a los demandados que según los autos no consta
habérseles notificado la citación ni haber comparecido en el
caso.  La teoría que se sostiene en dicho caso es que los
demandados jamás comparecieron ante la corte sentencia-
dora.  El caso de *Clarke* v. *Mohr,* muestra por su propio
texto que la enmienda tiene que ser esencial y que la corte
debe haber dejado de adquirir jurisdicción.  Esta distinción
se establece más claramente en el caso de *Johnson* v. *Phenix
Ins. Co.,* 146 Cal. 576–577.  La corte indicó que lo que había
sido resuelto en el caso de *Clarke* v. *Mohr* no podía tener
aplicación a un caso en que la sentencia se ha dictado a favor
de una persona que según los autos en realidad había sido
hecha parte en la acción.

Muy poca duda podía existir en este caso de haberse hecho
parte a la Sucesión Gallart si la citación mediante publicación
podía utilizarse.  Pero ¿adquirió jurisdicción la corte inferior
sobre la Sucesión de Gallart por virtud de la publicación?
Esto es más que dudoso pues no existe nada en los autos
que muestre que la acción (aunque en ella estaban envueltos

bienes inmuebles y hasta ese punto era *in rem*) fuera otra cosa que una acción personal, por lo menos en lo que respecta a la Sucesión de Gallart. Si se considera que la acción según su naturaleza es solamente reivindicatoria entonces la Sucesión de Gallart era completamente innecesaria puesto que Rubert Hermanos estaban en posesión de la finca. Si por el contrario como más bien parece, se le considerara como una acción personal, al menos por lo que toca a la Sucesión Gallart no vemos que dicha sucesión se hubiera hecho parte debidamente en la corte inferior y por tanto esa corte no adquirió jurisdicción sobre aquélla. Creemos que era necesaria la citación personal.

Por otra parte, la corte consideró el caso enteramente por sus méritos y estamos de acuerdo con sus conclusiones. Las partes sometieron de tal modo el caso y se dictó sentencia a favor de los demandados. En vista de estas circunstancias opinamos que Rubert Hermanos tiene derecho a insistir en su sentencia. Cualquier duda que hubiera respecto a si la sucesión era o nó parte necesaria solamente militaría en favor de la confirmación de la sentencia después de haber sido sometido el caso y de celebrado el juicio por sus méritos contra ellos. En verdad que los mismos apelantes insisten en que la Sucesión Gallart no era parte en absoluto en la corte inferior. Ellos consideran el caso como un juicio y una sentencia contra Rubert Hermanos solamente.

De todos modos, si alguna duda pudiera haber sobre denegación o concesión de la moción para que se desestime el recurso preferimos resolverlo en el sentido de decidir el caso por sus méritos por cuanto esa resolución conduce a la confirmación de la sentencia y no estamos convencidos de que la Sucesión Gallart era parte necesaria para el remedio principal, que solicitan los demandantes en esta acción.

Debe confirmarse la sentencia apelada.

*Confirmada la sentencia apelada.*

Jueces concurrentes: Sres. Presidente Hernández y Asociados del Toro, Aldrey y Hutchison.